8AO 91 (REV.5/85) Criminal Complaint    AUSA 05/09/2002    (312) 886-1000

FILED
MAY 0 9 2002
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

# UNITED STATES DISTRICT COURT

__NORTHERN__ DISTRICT OF __ILLINOIS, EASTERN DIVISION__

UNITED STATES OF AMERICA

v.

UMAR FAROOQ and
MOHAMMED AKHTER, aka
MUHAMMAD SALEEM, SALEEM MUHAMMAD,
MOHAMMAD SALEEM, and MUHHAMMAD SALIM

MAGISTRATE JUDGE MASON

**CRIMINAL COMPLAINT**

CASE NUMBER: **02CR0473**

I, __Susan Woods, FBI__, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. Starting in or around July 2000, and continuing to in or around July 2001, in __Cook__ County, in the __Northern__ District of __Illinois__, and elsewhere, defendants did

devise, intend to devise, and participate in a scheme and artifice to defraud Cisco Corporation and its distributorship companies, and to obtain moneys and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, on or around February 7, 2001 and on or around July 24, 2001, did transmit and cause to be transmitted by means of wire communication in interstate commerce, certain signs and signals, namely, wire transmissions from National City Bank in Chicago, Illinois, to Bank of America in Dallas, Texas, in order to effect the transfer of funds in the Net Nirvana bank account at National City Bank in Chicago, Illinois to the bank account of TechData Corp., a Cisco Corporation distributorship, at Bank of America in Dallas, Texas;

in violation of Title __18__, United States Code, Section(s) __2 and 1343__.

I further state that I am a(n) __Special Agent, FBI__ and that this complaint is based on the following facts:

See attached affidavit.

Continued on the attached sheet and made a part hereof:    __X__ Yes    ___ No

_Signature of Complainant_

Sworn to before me and subscribed in my presence,

May 9, 2002                                      at    Chicago, Illinois
Date                                                   City and State

MICHAEL T. MASON, U.S. Magistrate Judge           _Signature of Judicial Officer_
Name & Title of Judicial Officer

| | | |
|---|---|---|
| STATE OF ILLINOIS | ) | **UNDER SEAL** |
| | ) SS | |
| COUNTY OF COOK | ) | |

## AFFIDAVIT

I, Susan E. Woods, Special Agent, Federal Bureau of Investigation, being duly sworn under oath state as follows:

1.	I am a Special Agent with the Federal Bureau of Investigation (FBI). I have been employed as a FBI Special Agent for approximately four years. As part of my regular duties, I investigate criminal fraud and white collar crime offenses, including but not limited to mail, wire, and bank fraud, and other financial crimes involving the use of false and fraudulent pretenses to effect such criminal behavior.

2.	The limited purpose of this Affidavit is to establish probable cause that defendants UMAR FAROOQ; MOHAMMED AKHTER aka MUHAMMAD SALEEM aka SALEEM MUHAMMAD aka MOHAMMAD SALEEM aka MUHHAMMAD SALIM; and others known and unknown, have committed wire fraud in violation of Title 18, United States Code, Sections 2 and 1343. Accordingly, the information contained in this Affidavit is only a summary of the investigation and does not contain everything that is known about the defendants and the events described. My knowledge of the facts contained in this Affidavit is based on interviews, review of records, information from other law enforcement officers, and information provided by a corporate security investigator at Cisco Corporation.

3.	Cisco is a multi-national manufacturer and distributor of computer hardware, including computer networking and Internet equipment. Cisco enters into agreements with resellers throughout the country to sell Cisco products to end-users, who are typically businesses or

governmental agencies. Cisco-authorized resellers received a discount on Cisco products in order to facilitate the sale of Cisco products to end-users.

4. At times material to this Complaint, Cisco operated a trade-in program that allowed end-users to trade in their current computer hardware, which was typically hardware manufactured by a competitor of Cisco or older Cisco products, when the end-users purchased Cisco products that performed the same or similar functions as the current hardware. End-users that participated in the trade-in program received trade-in credits toward the purchase of the Cisco products. Resellers of Cisco products arranged for the trade-in credits with Cisco sales account managers by completing Credit Authorization Forms that contained information such as the name of the reseller, the name of the end-user, the dollar amount of the trade-in credit, and the dollar amount of the Cisco purchase. Resellers obtained the trade-in product from the end-users, and then the resellers shipped or otherwise delivered the trade-in product to Cisco warehouses.

5. According to Illinois Secretary of State records, UMAR FAROOQ is the registered agent and principal of a company that purported to be an authorized reseller of Cisco products: Net Nirvana, which was located in Chicago, Illinois. According to Secretary of State records, Net Nirvana was incorporated on or around August 23, 2000. According to a computer database containing Internet domain name information, FAROOQ is the administrative contact for NetNirvana.com, located at 650 W. Lake Street, Suite 230, Chicago, Illinois 60661.

6. According to Illinois Secretary of State records, Individual A is listed as the incorporator of Xiber Connect, which purported to be an authorized re-seller of Cisco products, and purported to be located in Charlotte, North Carolina. According to Individual A, he knew FAROOQ as a friend of the family for several years. In or around later 1999, FAROOQ approached Individual

A and asked to use Individual A's name to incorporate a purported subsidiary of FAROOQ's current business, Net Nirvana. The new subsidiary would be called Xiber Connect and be operated by MUHAMMAD SALEEM,[1] who is FAROOQ's brother. In exchange, Individual A would be able to attend free training provided by Cisco to receive a certification as an expert on Cisco products, and FAROOQ and SALEEM would also pay Individual A for work he performed for Xiber Connect in connection with picking up and delivering Cisco products. Individual A agreed to the arrangement and Xiber Connect was incorporated in Illinois using Individual A's name on or around March 22, 2000.

7. According to Individual A, Xiber Connect did not actually have any physical operating presence at its purported business address of 5935 Carnegie Blvd, Charlotte, North Carolina 28262. The FBI has confirmed that the address belongs to a commercial service that provides a phone number and an address for receiving mail but no operations are conducted from the address.

8. According to Individual A, SALEEM conducted the daily operations of Xiber Connect from Chicago, including the submission of orders to Cisco as described below. According to a computer database containing Internet domain name information, the administrative and billing contact for XiberConnect.com is listed as Mohammad Saleem, P. O. Box 803288, Chicago, Illinois 60680. The database also lists an alternative spelling of Muhammad Salim.

9. In or around July 2000, Cisco Channel Sales Account Manager A began to sell Cisco products to FAROOQ and SALEEM through Xiber Connect. In or around August 2000, Cisco

---

[1] Although Mohammaed Akhter is known by various names as listed in Paragraph 2, this Affidavit refers to him as Muhammad Saleem because that was the name by which he was most commonly known in the context of the facts described.

Channel Sales Account Manager B began to sell Cisco products to FAROOQ and SALEEM through Net Nirvana. According to Sales Manager B, FAROOQ operated Net Nirvana; FAROOQ and Sales Manager B discussed business on a weekly basis and met approximately ten times in-person to discuss business. According to Sales Manager B, when he asked FAROOQ if Net Nirvana was connected to Xiber Connect, FAROOQ denied any connection, despite, as described below, the use of Net Nirvana's bank account to purchase Cisco equipment on Xiber Connect's behalf. Furthermore, Cisco Manager of Channel Operations A has known FAROOQ for over four years and knew FAROOQ to be the operator of Net Nirvana. None of the ten Cisco employees who reported contact with FAROOQ in the context of Net Nirvana and Xiber Connect dealings with Cisco has, according to the employees, ever engaged in any business contact with Individual A.

10. Although Cisco's operating procedures require that a reseller enter into a purchasing agreement with Cisco in order to be an authorized reseller, no purchasing agreement exists between Cisco and Net Nirvana or Xiber Connect. Despite the absence of a reseller purchasing agreement, Channel Sales Account Manager A and Channel Sales Account Manager B treated Net Nirvana and Xiber Connect as authorized resellers of Cisco products, including granting Net Nirvana and Xiber Connect discounts available to authorized resellers.

11. A preliminary review of records by Cisco shows that from in or around July 2000 to in or around July 2001, Xiber Connect submitted approximately at least 70 Credit Authorization Forms with an approximate total of $4,906,318.68 in trade-in credit. However, a review by Cisco of records at the Cisco warehouses to which the trade-in product should have been received shows that no trade-in product was ever received from Xiber Connect. Although the purported signature of Individual A appears on several Credit Authorization Forms submitted by Xiber Connect,

Individual A states that, although he authorized the signing of two forms in his name, he neither authorized nor signed any other forms with his purported signature. Upon my personal inspection, the signature on the Xiber Connect Credit Authorization Forms do not resemble the signature of Individual A on Individual A's state driver's license, but almost all of the signatures on the forms do resemble the signature of SALEEM on bank account signature cards.

12. A preliminary review of records by Cisco shows that from in or around August 2000 to in or around July 2001, Net Nirvana submitted approximately at least 130 Credit Authorization Forms with an approximate total of $4,445,854.71 in trade-in credit. However, a review by Cisco or records at the Cisco warehouses to which the trade-in product should have been received shows that no trade-in product was ever received from Net Nirvana.

13. In addition to the absence of trade-in product, the investigation has also revealed that the Credit Authorization Forms submitted by FAROOQ and SALEEM contained false information concerning the end-users purportedly purchasing the Cisco products and purportedly trading in product for credit. According to Cisco Regional Sales Manager A, on or around January 12, 2001, Cisco Regional Sales Manager A met with FAROOQ at Cisco's Charlotte, North Carolina office. FAROOQ told Regional Sales Manager A that FAROOQ did not want to disclose the identity of the end-users to which Xiber Connect was selling Cisco products.

14. As an example of false end user information listed on Credit Authorization Forms, from February 14, 2001 through in or around July 2001, approximately seven Credit Authorization Forms submitted by Net Nirvana list Globalcom of Chicago, Illinois as the end-user, along with approximately $238,875.04 in trade-in credit. However, Globalcom employees maintain, based on a review of Globalcom's records, that Globalcom neither traded in product for Cisco products nor

attempted to do so. Although Globalcom did purchase Cisco product from Net Nirvana, Globalcom employees maintain, based on a review of Globalcom's records, that Globalcom made only six purchases from Net Nirvana and those purchases were from only on or around August 11, 2000 to on or around February 6, 2001. The six purchases totaled only approximately $76,313.66 in Cisco product from Net Nirvana.

15. On or around July 23, 2001, Net Nirvana submitted a Credit Authorization Form listing the reseller contact person as Muhammad SALEEM and the end-user as Globalcom. The Credit Authorization Form listed a purported trade-in credit of $48,292.00, which reduced the purchase price to approximately $81,592.06. On or around July 24, 2001, a Cisco distribution company supplied the ordered computer hardware to Net Nirvana, and on the same day, the Cisco distribution company received a $80,800 wire payment from Net Nirvana bank account 644958, held by National City Bank, Chicago, Illinois, which represented partial payment for the purported Globalcom purchase. According to records and representatives of the National City Bank, the only account holders of Net Nirvana bank accounts were FAROOQ, SALEEM (using the name Akhter) and Nadya Medhi, Farooq's wife. A review of currently available bank records of this Net Nirvana account reveals that, from the account, approximately $2,234,500.00 was wired to a bank account at the Muslim Commercial Bank, Karachi, Pakistan, belonging to Progressive Software, a company that is owned by FAROOQ's father, according to Individual A ; approximately $491,574.87 was paid to SALEEM; approximately $329,193.32 was paid to Nadya Medhi and Medtech, a company incorporated by Medhi; approximately $69,857.49 was paid to FAROOQ; and approximately $34,508.83 was paid to Individual A in checks with the notations for "delivery" or "pickup" in the memo line.

16.     Similarly, approximately two Credit Authorization Forms submitted by Net Nirvana list the City of Crystal Lake, Illinois as the end-user. However, according to employees of the Crystal Lake, the city only made one purchase through Net Nirvana for approximately $29,000.00 and did not trade in any equipment. Credit Authorization Forms submitted by Net Nirvana falsely state that Crystal Lake purchased approximately $131,840.00 in products from Cisco and purportedly traded in $54,032.00 worth of equipment.

17.     As another example of false information concerning an end-user, approximately two Credit Authorization Forms submitted by Xiber Connect purport to list "SRH Tech" of Charlotte, North Carolina as the end-user; Nick Mehdi as the contact person for "SRH Tech." However, based on an investigation by Cisco, the listed address and phone number are not assigned to an "SRH Tech," and are not in Charlotte but rather in Charleston, South Carolina. In addition, Nick Mehdi is the brother-in-law of FAROOQ.

18.     On or around February 7, 2001, Xiber Connect sent via facsimile a Credit Authorization Form from Chicago, Illinois to a Cisco sales employee in Charlotte, North Carolina. The Credit Authorization Form was purportedly signed by Individual A; however, according to Individual A, he did not sign the form, and upon my inspection, the signature resembles that of SALEEM on bank account signature cards. The Credit Authorization Form listed the end-user as a company named Conbraco, purportedly of 5666 East Tryon Street, Charlotte, North Carolina, and a purported trade-in credit of $17,992.96, which reduced the purchase price to $47,152.96. On the same day, February 7, a Cisco distribution company supplied the ordered computer hardware to Xiber Connect, and on the same day, the Cisco distribution company received a $123,000 wire payment from Net Nirvana bank account 644958, held by National City Bank, Chicago, Illinois,

which represented payment for the purported Conbraco purchase as well as other purchases submitted by Xiber Connect. In addition, Conbraco Industries, Inc. of North Carolina is a valve parts company with a corporate address in Matthews, North Carolina, not in Charlotte, North Carolina. According to a telephone number database, there is no public telephone listing for Conbraco in Charlotte, North Carolina, and there is no address of "5666 E. Tryon Street" in Charlotte, although there is an address of 5666 S. Tryon Street.

19. Furthermore, according to Cisco, equipment traded in by end users typically comprise entire system hardware as opposed to individual system parts because Cisco and competitive products are not usually compatible with each other. In contrast, an unusually large number of the Credit Authorization Forms submitted by Net Nirvana and Xiber Connect claimed that the end users were trading in multiple quantities of the same individual components. Moreover, the listed end-user on many of the Net Nirvana and Xiber Connect Credit Authorization Forms was often a small business or government agency with no need for the large quantity of system parts listed as the purported trade-in product.

20. On or about August 7, 2001, the company that leased shared office space to Xiber Connect received a letter purporting to be from Individual A, but in fact was not from Individual A. The letter informed the rental company that effective September 10 or 11, 2001, Xiber Connect was cancelling its lease. In or around early August 2001, FAROOQ told Individual A that there was trouble with Cisco, and that Individual A should not speak with Cisco. FAROOQ also told Individual A that FAROOQ and SALEEM were leaving the country, and offered to pay Individual A to leave the country, but Individual A refused. In or around September to December 2001, FAROOQ occasionally telephoned Individual A and told him that FAROOQ was in Pakistan at

times, or in Canada, at other times. FAROOQ told Individual A not to talk about Net Nirvana or Xiber Connect with anyone. In or around December 2001 and early January 2002, according to another tenant of the office building that housed Net Nirvana's offices located at 650 W. Lake Street in Chicago, SALEEM removed all of the office equipment and business records from the office.

21.  Based on the foregoing information, I believe there is probable cause to believe that UMAR FAROOQ and MUHAMMAD AKHTER have committed wire fraud in violation of Title 18, United States Code, Sections 2 and 1343.

FURTHER AFFIANT SAYETH NOT

Susan E. Woods, Special Agent
Federal Bureau of Investigation

Sworn and subscribed before me on
this __9th__ day of MAY 2002

HONORABLE MICHAEL T. MASON
United States Magistrate Judge